FILED

2009 Aug-19  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOYCE FRANKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:07-cv-006-TMP |
| | ) | |
| CITY OF HOMEWOOD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
REGARDING  DEFENDANTS' MOTIONS  FOR SUMMARY JUDGMENT**

_____This matter is before the court on the motions for summary judgment filed by defendant City of Homewood ("Homewood" or "the City") (Doc. #151), by defendant Linda Cook (Doc. #147), and defendant Jefferson County Personnel Board ("Personnel Board") (Doc. #146), on November 3, 2008, which are supported by briefs and evidence.  Plaintiff Joyce Franklin filed a brief in opposition, along with evidence and a statement of undisputed facts, and the defendants filed replies. Homewood, along with other defendants Cook and the Personnel Board, also filed a motion to strike portions of the plaintiff's statement of facts and evidence (Doc. #178).[1]  Plaintiff further seeks to strike portions of the motions for summary judgment (Doc. #186).[2]  At issue in these matters is the

---

[1]      The court has addressed the various evidentiary objections raised by defendants in a separate order.

[2]      The motion, based on the defendants' assertions of affirmative defenses made in an untimely matter, is MOOT based upon this court's order regarding amended pleadings. (Doc. #187).

defendants' contention that they are entitled to summary judgment on all of plaintiff's claims against them.

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form

necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must

be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


## II.  FACTS

For purposes of summary judgment, having viewed the facts in the light most favorable to the plaintiff as the non-moving party, the following facts[3] are accepted as true:

In November 1999, Joyce Franklin was hired by the City of Homewood as an Administrative Assistant III, a classification under the civil service merit system of the Jefferson County Personnel Board.  Pursuant to the Enabling Act that established the Board, there are rules and regulations which "govern the civil service of . . . all cities in Jefferson County with 5,000 or more residents."

---

[3]    Defendant Homewood has set forth a narrative summary of facts for purposes of its motion at pp. 11 - 19 of its brief (Doc. #152), and further has adopted the factual assertions of defendants Linda Cook and the Personnel Board of Jefferson County.  (Docs. # 146, 147).  The plaintiff has not directly addressed the facts proffered by the defendants.  Instead, plaintiff has submitted her own statement of the facts (Doc. #170), and asserts "additional" facts in her brief in opposition (Doc. #176).  The court recites here only those undisputed facts that are relevant and material to the motions for summary judgment.  Most of the issues raised in the motions turn on legal, not factual, questions.  Accordingly, the facts recited here are much more concise than plaintiff's rambling recitation of all the events that have occurred during her decade-long employment with the defendant City.

Homewood is one of the jurisdictions within the authority of the Board, which was created by the Alabama Legislature to provide personnel hiring and classification services for various public authorities within Jefferson County. (Act. No. 248 of the 1945 Legislature ( "Enabling Act"), Defendants' Joint Submission, Ex. 7). The Board sets and promulgates rules and regulations regarding hiring, classification, promotion, compensation, and termination of municipal employees within the cities within Jefferson County, and the elected officials within those jurisdictions are then required to "aid in all proper ways in carrying into effect" the provisions of the Enabling Act.

The Rules and Regulations of the Personnel Board ("Rules") include the following definitions:

> Appointing Authority. Any person, officer, board, council, commission or other governmental body whose lawful jurisdiction or powers are confined wholly or primarily within the territorial limits of Jefferson County and who or which possesses final power to appoint persons to services, jobs, offices or positions, the compensation of which is paid in whole or in part from the public funds of Jefferson County or from the public funds of a municipality in Jefferson County subject to this Act. Except as otherwise provided by law, the Board will consider the mayor to have final decisionmaking authority on behalf of a municipality.

> *          *          *

> Certificate of Eligibles. A certificate issued by the Director to an Appointing Authority, containing the names of those individuals, in random order, eligible to be appointed or promoted to a particular position in the Classified Service.

> Certification. The process of submitting a Certificate of Eligibles to an Appointing Authority for the purpose of filling a particular position in the Classified Service.

> *          *          *

> Classification. The process of assigning a position to the appropriate Class.

Classified Employee.  A person appointed (i.e., hired) by an Appointing Authority for employment in the Classified Service.

\*               \*               \*

Eligible Candidate.  An individual whose name appears on an Eligibility List.

Eligibility List.  A record containing the names of all persons who have successfully completed the examination process, listed and ranked in order of their final scores from the highest to the lowest, and who are considered qualified for appointment or Promotion to positions in the Class for which the list exists.

\*               \*               \*

Pay Grade.  The range of Pay Step for the Class as set forth in the Pay Plan.

Pay Step.  The specific pay rate within a Pay Grade as set forth in the Pay Plan.

Probationary Period.  The uninterrupted twelve (12)-month period of paid service following appointment or Promotion in the Classified Service.

Promotion.  Any change in an employee's Class for which the Pay Grade is higher.

Rule 1.3.  (Defendants' Joint Submission, Ex. 8).  Pursuant to § 16 of the Enabling Act,  the Appointing Authority for the City of Homewood is its mayor, and Barry McCulley was the mayor of Homewood at all times relevant to this action.

The Personnel Board Rules further provide that:

The question of whether or not an employee has been assigned to the proper Class and Pay Grade shall be a matter subject to the decision of the Board.

Rule 7.1(c).

6

The Rules govern the appointments, promotions, demotions, transfers, and assignments of classified employees of municipalities. Types of appointments relevant to this actions include:

Unless explicitly provided for in these Rules, all appointments to the Classified Service shall be one of the following types:

a. <u>General Appointments</u>. In general, except as provided in subsections (b) through (h) of this Rule, all appointments to positions that require or are expected to require continuous employment for an indefinite period shall be made through the announcement and competitive processes set forth in the Act and these Rules.

b. <u>Provisional Appointments</u>. In the absence of an appropriate Eligibility List, the Board may authorize, by unanimous approval (*i.e.*, all three (3) members), the filling of a vacancy by provisional appointment. Any such candidate for provisional appointment must meet all education, experience and related requirements set forth by the Director. Provisional appointments shall be for a period of not more than four (4) months, and no provisional appointment shall be continued for more than ten (10) Business Days after the establishment of any Eligibility List for the class. Any provisional appointee who fails to achieve a score on the competitive examination placing him or her in certifiable range on the Eligibility List shall be removed from the provisional appointment after the appropriate Eligibility List is established. The provisional appointment of any individual shall not confer on the appointee any rights of status, appeal or related rights set forth under these Rules.

*          *          *

Rule 11.3(a) and (b).

The Rules further provide that employees given promotions be placed on probation:

a. <u>General Rule</u>. Any employment in a position, whether through an initial appointment or Promotion, shall be subject to the completion of a satisfactory Probationary Period.

b. <u>Following Initial Appointment</u>. A Classified Employee in his or her Probationary Period following an initial appointment may be dismissed, demoted, or suspended without the right to appeal.

7

     c. <u>Following Promotion</u>.  A Classified Employee who is demoted during the Probationary Period immediately following his or her promotion shall have the option of returning to the position held prior to the promotion, if still vacant.  If the position is filled, the Director shall determine the manner in which the employee may, if possible, be retained in the Classified Service, being closely guided by the provisions of Rule 11.12.  The demoted employee may elect to separate from the Classified Service and to have his or her name retained on the layoff list for the position from which he or she was promoted for a period not to exceed two (2) years.

Rule 11.6.(a), (b), and ©).


The Personnel Board Rules further define "demotion," and allow for appeal only from a

demotion for cause:


     An employee may be demoted for any of the following reasons:

     a.  When an employee is demoted for cause as defined in Rule 12.2;

     b.  When an employee voluntarily requests or accepts the demotion; or

     c.  When an employee would otherwise be laid off because his or her position is being abolished, reclassified to a higher grade or a lower grade, lack of work, or lack of funds.

     An employee who has completed the Probationary Period for the Class from which he or she is demoted may appeal a demotion for cause as defined in Rule 12.2  No other Demotion shall be appealable.


Rule 11.7.  Similarly, some matters are subject to a grievance procedure provided under the

Rules, but other matters are specifically excluded:


     Matters addressed by, or discussed in, another rule (i.e., classification, pay, reductions-in force, efficiency ratings, etc.), regardless of whether the other rule contains an appeal procedure.  An employee may not circumvent this exclusion by

8

alleging that the Rule in question was applied in an illegal, retaliatory, disciplinary, or other unfair manner; ...

Rule 15.3(a).

At all times relevant to this action, Franklin's immediate supervisor was defendant Linda Cook, the City Clerk for Homewood, who also is a classified employee under Personnel Board rules. When Franklin was interviewed in 1999, Cook told Franklin that there was "no shortage of overtime" available in her office. In August 2002, the City created the classification of Administrative Assistant IV and promoted Franklin to that new position. Cook filled out the paperwork necessary for Franklin to be promoted to the new position. In order for such changes to occur under the Personnel Board Rules, the City must complete a process for applying to the Board for recognition of the new classified position and request a List of Eligibles from which to make the appointment. The Board must approve the new classification and certify a list of eligible candidates from which the position may be filled. Franklin was promoted to Administrative Assistant IV.

Part of Franklin's duties involved attending City Council meetings and transcribing the minutes of the meetings from tape recordings of the meetings. On May 18, 2004, Franklin wrote the following letter to Cook, her supervisor:

> Mrs. Linda J. Cook
> City Clerk
> City of Homewood
>
> Dear Linda:
>
> I have two reasons for writing this letter. One is to explain why I was so upset on my job yesterday and the other is because I realize that if I am going to continue to be productive on my job, I need to say this.

After some 36 years of employment, I have learned a few things. I have learned to do each job to the best of my ability, no matter what the assignment, because someone values me enough to pay me to do that job. I have learned to be kind to all people and to treat everyone with respect, regardless of rank. I have learned to accept criticism when it is justified and to rebound from harsh words. I have learned that there is a time to be silent and a time to speak.

Most of all, having been on the other side, I have learned to appreciate a good job. Homewood has been good to me and I am doing the kind of work that I love doing. It is for that reason, that I believe my career here in Homewood is worth saving.

Some years ago, after 26 years of employment in another jurisdiction, I found myself in a situation that I, quite literally, did not know how to handle. I was not treated well on my job, and I struggled daily with a fear that I could not afford to make an error in my work or my situation would worsen. Over time, I became paralyzed with such fear that I could no longer be the productive employee that I wanted to be and had been previously. I literally tried to be perfect in everything I did, but I discovered that no one is error-free in their work, even though that was the personal standard I set for myself at that time due to my situation. When I came to Homewood, I carried with me the remnants of that emotional mindset and a deep desire to preserve every working relationship no matter what I had to do. Someone told me once that whatever you compromise to keep, you will lose. I believe that is true. If we compromise our own self worth, if we remain silent when we need to speak in order to preserve a working relationship, in the end we will lose it.

I have struggled for some weeks now to overcome the events of April 12, 2004. I have mentioned the incident to no one, but my husband, and only then because I needed to talk it out with someone. Talking it out has helped me to deal with it, but I have not had a feeling of acceptance or satisfaction about the events that took place in your office with Mike Kendrick that day. I have been able to deal with the words that were spoken, but have been unable to come to a point of acceptance that it was right or justified. I have always had the utmost respect for Mr. Kendrick from a professional standpoint, but I believe he was out of line that day. I do not believe that it is ever justified to belittle a person and it is certainly counter-productive in helping that person do a better job. Quite frankly, I have never been so comfortable with my own perfection that I felt I had a right to do that to anyone. When those events started to unfold in your office that day, I was transported back to another place and time where I was treated in a similar manner on an almost daily basis. Even though my previous experience left me with the ability to handle words spoken in anger, I still left your office that day with such low self esteem that it has affected me to this day.

10

Your words to me yesterday, however, have a much greater impact and have cut me much deeper than anything that happened on April 12th because the standard that you set for me is one that I know I cannot meet. I know that I cannot be error-free in my work; no one can. I won't belabor you with my workload. Suffice it to say that I have so little time on my job to do Council minutes that following any given Council meeting, you will probably find me at my kitchen table doing them at home. I do not have to tell you the volume of work that goes through our office, but neither would I want to be misleading by saying that I would be error-free if the volume was not so high. I can only say that a high volume and backlog can contribute to errors and omissions.

It is true that I did make two errors or omissions on my job recently. One of those was the vacant lot on Clermont Drive. As you know, we use a system when we do the Council agenda of taking each printed item off the previous agenda that was handled or sent to committee and leaving those items on that were carried over. Items that were added to the agenda the night of the meeting and placed in committee are usually picked up from the committee reports and placed on the agenda. In the case of the Clermont Drive item, that was an item that was added to the agenda the night of April 26th, a public hearing was set that night, and the item was carried over. When I went back to the April 26th agenda to begin doing the May 10th agenda, I had neither a printed item from the previous agenda nor an item coming out of committee. I just failed to pick it up. As far as the RFP item is concerned that I put on the Finance agenda, I have already explained to you why I put that item in Finance. For both of these errors, I apologize. I am not trying to justify them, I am just explaining to you how they occurred.

I had a phone call late yesterday from a Council member who said she did not get her packet in the mail, even though I personally mailed it to her. Normally, I would have given the Council member the meeting times, which I did, tell her I was sorry that she did not receive her packet, and go about my work. Instead I found myself becoming unusually worried and anxious about it due to what had transpired earlier that day. I am saying all of this because I want to be able to go home each night and sleep peacefully without worry that I might make an error the next day and endure the incredible stain [*sic*; strain?] that I know that will place on me. I cannot get into that frame of mind again where I am in a continual stated [*sic*] of stress and panic that something will go wrong.

You have treated me kindly since my employment in Homewood and I really do sense that your heart is in the right place. I can tell this by the way you have reacted with me when things have happened and the way I have seen you act with others. I do believe, however, that some things can be said in the workplace and mandates can be placed on an employee that put such a strain on the working

relationship that it begins to deteriorate.  I do not want to see that happen to us.  At the risk of this letter causing some resentment or anger at me for having written it, I would rather see that reaction now than to face each day with stress and worry about every little detail of my job.  I know from experience that living with that kind of daily stress can affect your health and general well being, on and off the job.  Yes, you do have a right to go to any employee and expect good performance and you need to be able to talk to that employee constructively.  I, on the other hand, need to be able to come to you when an error occurs, without a deep seated fear of severe reprisal.

I know of few employees, myself included, who do not respond well to kind words and constructive criticism when it is warranted.  I have been devoted to my job here in Homewood because I appreciate it and nothing has happened to cause me not to continue to be committed.  I cannot promise you that I will not make an error in the future, but I can promise that I will do my job as perfectly as I humanly can until such time as I retire from the city or the City of Homewood decides to terminate the relationship.  In the interim, I will not hesitate to seek help from the City's EAP, employee assistance service, if I feel that such services will help me cope with any situation on my job.  This is something that I have hesitated to do in the past, but looking back, I realize that was a mistake.

Thank you for reading this letter and for being good to me over the past few years.  I hope that we can move on from here and get to a place where we can enjoy each working day to its fullest.

Sincerely,

Joyce Franklin
Administrative Assistant

(Defendants' Joint Submission, Ex. 11).  After this letter was written, Cook gave Franklin fewer duties, spoke to her harshly, and failed to support her reclassification to a higher pay grade.[4]  She

---

[4]      Plaintiff asserts this lack of support by Cook even though, in a letter to City Council members dated February 24, 2006, she stated she had "my supervisor's support" for the Minute Clerk classification she was then seeking.

further failed to authorize any overtime work for Franklin or to see that the City paid for overtime Franklin says she worked.

In 2003, a Personnel Board job survey[5] concluded that Franklin's classification as Administrative Assistant IV was proper, but she appealed that decision and sought reclassification as a Municipal Records Supervisor.  The Administrative Assistant IV classification carried a pay grade of 19, while the Municipal Records Supervisor classification would be a pay grade 21.  Her appeal was denied, and she again appealed.  The court-appointed receiver over the Personnel Board, Dr. Ronald Sims,  ultimately determined that the actual job duties performed by Franklin were more properly classified as a Municipal Records Supervisor, at the higher pay grade.  Homewood subsequently adopted the Personnel Board's classification survey, including the Municipal Records Supervisor re-classification sought by Franklin, in a December 20, 2004, resolution of the council.

At the time, there was no existing register of eligibles from which Homewood could fill the position of Municipal Records Supervisor.  Under Personnel Board rules, the position was a new classification for Homewood, but no testing had been performed and no List of Eligibles existed.  Although Franklin was the incumbent, she still was required to qualify for the position by passing the necessary testing and being included on a List of Eligibles.    Franklin was "provisionally" appointed[6] to the position effective January 1, 2005, and she remained in the provisional Municipal

_____

[5]     By statute the Personnel Board is required to survey every classified employee's actual job duties to determine whether the employee is properly classified.  Homewood's employees were surveyed in 2003 and 2004.

[6]     One witness, Roger McCullough, the senior manager for classification at the Personnel Board, testified that Franklin was given a "temporary" appointment that was extended several times.

Records Supervisor position for more than a year, receiving the commensurate pay raise to pay grade 21.

During the time Franklin held the provisional appointment, Homewood did not submit to the Personnel Board a request for a List of Eligibles required to make the appointment to the provisional position. Cook testified that the mayor's office was responsible for making the request. Consequently, the board never generated a List of Eligibles, or completed the creation of a test for the position of Municipal Records Supervisor. Nevertheless, beginning in October 2005, the testing division of the Personnel Board began a job analysis of the Municipal Records Supervisor classification for purposes of creating an eligibility test for the position. This analysis raised questions about the propriety of classifying Franklin's position as Municipal Records Supervisor.

In the course of the Board's examination of Franklin's duties, Board employee Nancy Cleveland recommended in early 2006 that Franklin be assigned the classification of Minute Clerk as an alternative to Municipal Records Supervisor. The Minute Clerk classification would be at a pay grade of 22. Cleveland's recommendation was communicated to the Homewood City Council, which referred the matter to the City's Finance Committee. In February 2006, the Finance Committee recommended against the creation of the Minute Clerk position, and at a subsequent meeting of the entire City Council, the Council voted to return the question to the Finance Committee for further inquiry. The Finance Committee then met with Cleveland and two other Personnel Board representatives (including senior manager McCullough and executive director Lorren Oliver) on April 3, 2006, in what is described as a very contentious and adversarial meeting. Accounts of the meeting reveal that the Personnel Board representatives were defending the

14

expressed alternative Minute Clerk classification against the Finance Committee members' concerns that it would increase Homewood's personnel expenses without the Board receiving any request from or discussion with the City about the new classification. The Finance Committee members were concerned that the Personnel Board could unilaterally create a new classified position for a Homewood employee, with increased personnel expense, without Homewood having a say. Three weeks later, in an April 25, 2006, letter signed by Personnel Board executive director Lorren Oliver, but drafted by senior manager McCullough, the Personnel Board advised the City Council that both the reclassification to Municipal Records Supervisor and the recommendation of the alternative classification of Minute Clerk were "errors" and not the appropriate classification for Franklin's duties. The letter stated that "it is the Board's determination in this matter that Ms. Franklin's position is properly classified as Administrative Assistant IV." Neither the Board nor the City ever awarded the Minute Clerk position to Franklin, although both discussed the matter at some length.

Apparently as a result of the communications with the Personnel Board, Franklin's provisional appointment as a Municipal Records Supervisor was terminated by the City on February 6, 2006, and she returned to her previous classification of Administrative Assistant IV. During this same time period, in February 2006, Franklin sent a letter to then-City Council President Jennifer Busby, with copies to all Council members, in which she stated that she was working "many hours at home in order to complete the minutes [of the City Council meetings]." In that letter, plaintiff states:

15

February 24, 2006

Hand-delivered

Ginger Busby, President
Homewood City Council
Homewood, Alabama 35209

Dear Ginger:

Just this week, I was told that, in a February 21, 2006, Finance Committee meeting, the members of that committee decided to recommend to the full Council terminating the position of Minute Clerk, which I have been filling even though my classification is only Administrative Assistant IV.  You may already know that one of the principle functions of Minute Clerk is to take all clerical responsibility for Council minutes.  Because I have been doing whatever tasks are asked of me for so long, including Council minutes, the Jefferson County Personnel Board, in its routine 2003-2004 audit, found that I had been working out of classification and determined that I should be classified as Municipal Records Supervisor.

As a result of the 2003-2004 job audit, the Personnel Board assigned me the classification of Municipal Records Supervisor, on a provisional basis, and I served in that capacity for a year.  I also continued to do the work for the Council with the minutes preparation.  Additionally, I continued to do many other assignments at the office and found that I had to work many hours at home in order to complete the minutes, which also continued to be assigned to me.  I have reported all of this in the past to my supervisor, Linda Cook.

Without my seeking the official job title of minute clerk or complaining in any way, the Personnel Board assigned that job to me.  I had only answered their questions honestly about all of my job assignments, and the auditors found in January 2006, in fact, that I was doing the work of the Minute Clerk.

Now I understand from my supervisor, Ms. Cook, that the reason for the Finance Committee's recommendation for dropping the job of Minute Clerk in Homewood is that the classification is not "warranted" and amounts to "just giving someone a raise", which, I was told that the committee would not do.  I do not know what could have been said to any Homewood council member on the Finance Committee to have elicited those comments or what has not been said.  I have tried to do a good job on all that I do, even buying some of my own equipment so that I could get all of the Council minutes done timely and accurately.  I hope that I have

been of some value to the Council. I have not been told that my work product in producing the minutes is in any way deficient, but if it is, then I will try to do better.

This decision on keeping for the Council the job of Minute Clerk will be coming up on the Consent Agenda on Monday because it is a dropped item. I would be remiss, to myself and to my family, if I did not tell the Council the facts about this reclassification prior to the vote on Monday. I would very much like to be classified as Minute Clerk because that is the job I have been doing, and it seems that the tasks I have done for the Council are necessary. I understand that this decision, however, is entirely up to the Council. While I realize that I am only a clerical person, it has been my understanding that the Council needs the work that I have been doing that are the tasks of the Minute Clerk. I believe that I am best qualified to be Minute Clerk, but I also understand that the Council may want me only to perform the work that is solely within my job classification. Right now, as the Personnel Board has determined, I am working out of classification, when I prepare the minutes which I realize you cannot allow to continue.

There are a good many more details about all of this if you care to know them. Some of them are as follows:

1. Up until February 6, 2006, I was still in the reclassified position of Municipal Records Supervisor, on a provisional basis, awaiting a test to be given by the Personnel Board. Having been in the reclassified position provisionally for over a year. I contacted the Personnel Board about mid-October, 2005 to ask when a test would be given for the Municipal Records Supervisor classification.

2. This prompted the Testing Division of the Personnel Board to begin the process of developing a test, a lengthy process that involved interviewing me about my job duties, as well as my supervisor and others. After my interview, I heard nothing further from the Personnel Board Testing Division until I received an e-mail stating that the Personnel Board wanted to meet with me and my supervisor on January 4, 2006 (copy of e-mail attached).

3. I did not know what was being discussed by others about my classification until January 4, 2006, when I walked into the meeting with the Personnel Board representatives, I had actually been checking the Personnel Board website almost daily so that I would not miss the test. It was only after I arrived at the meeting that I learned that the Personnel Board was not there to discuss the test, but, instead wanted to question whether they had placed me in the appropriate classification when they reclassified me a year earlier.

17

4.  They questioned me and Linda Cook for over two hours about my job duties and responsibilities.  During that meeting, both Ms. Cook and I continued to focus on the minutes as the most important and time-consuming aspect of my job.

5.  I was concerned about what action would be taken about this for two weeks until January 18, 2006, when Mayor McCulley told me that he had received a call from Nancy Cleveland of the Compensation and Classification Division, saying that the Personnel Board had reclassified my position to Minute Clerk (See attached e-mail from Nancy Cleveland of the Personnel Board).  I was delighted to have this official decision.  As explained above, after reading the class specifications for Minute Clerk, I realized that it was and is the most appropriate classification for the job duties I perform, and Ms. Cook has voiced her agreement with that to me on several occasions.  The Finance Committee vote on Tuesday to drop the Minute Clerk position altogether was most unexpected, especially in light of both Personnel Board approval and my supervisor's support and confirmation to me that the position was merited.  For all of these reasons, I have chosen to write you now.

6.  I want the Council to know that on February 6, 2006, I was demoted to my former position of Administrative Assistant IV (See attached e-mail from Linda Cook).  This demotion effectively ignored both the 2004 and 2005 Personnel Board reclassifications.  If the Council votes on Monday not to establish the Minute Clerk position, and I cannot be reclassified to Minute Clerk, I will be classified as an Administrative Assistant IV while performing the duties and responsibilities of minute Clerk.  I have attached a copy of the job specifications for Administrative Assistant IV and a copy of the Minute Clerk job specifications for your review.

Finally, the Personnel Board reclassified me for the reasons I have set out.  The Board does not know me personally, and I can think of no reason why they would just want to give me a raise.  I could tell by information known to the Personnel Board at the January 4, 2006, meeting and the two-week deliberation period that their decision was not a hastily-made one.

Therefore, I very much would like to be able to continue performing the Minute Clerk job.  My hope is that the Council will decide not to remove me from those duties.

Sincerely,

Joyce Franklin

(Defendants' Joint Submission, Ex. 22).

When the City Council voted to reject the classification of Minute Clerk, Franklin filed a grievance, contending that she should be reclassified as a Minute Clerk. The grievance was denied by the Personnel Board, pursuant to Rule 15.3(a), as a matter excluded from the grievance procedure. In August 2006, Franklin appealed the denial of her grievance, and the Board affirmed, further noting that "Franklin's allegation of retaliation cannot circumvent Rule 15.3." (Defendants' Joint Submission, Exs. 33, 34). There is no evidence that Franklin sought to file any grievance regarding the cancellation of the provisional appointment to the Municipal Records Supervisor position.

At some point in time not clear from the record, Franklin personally bought a transcriber for use in her work transcribing the City Council meeting minutes at home. When Franklin's letter of February 24, 2006, brought this to the attention of the City Council, the City reimbursed her for the price of the equipment, but did not pay her any overtime in relation to the time she alleges she worked at home. There is no evidence that Franklin ever made a claim or demand for payment of this overtime for working at home. Also, Cook's investigation into Franklin's request for overtime was to "go back and check the records to make sure that I had not overlooked any of the overtime slips requesting overtime or looked back to see whether she had requested to work overtime." Cook did not find "any documentation" that Franklin had requested overtime pay related to working at home, although she had requested and received overtime pay for attending City Council meetings after usual work hours. Franklin concedes that she did not turn in any request for overtime and did not document the hours of overtime she worked, but she now estimates that she worked 113 hours at home transcribing Council meeting minutes.

During calendar year 2005, Homewood began to experience budget problems, and beginning in fiscal year 2006 (which started on October 1, 2005), the City eliminated funding for overtime in the administration department headed by Cook. Franklin knew that she would not be eligible for overtime after that measure was enacted. Franklin asked to receive compensatory time in lieu of pay for overtime hours, but her request was denied. For a time, her work schedule was adjusted to enable her to attend Council meetings without incurring overtime, but eventually she was instructed not to attend the meetings. During usual work hours, she continued to transcribe the meeting minutes from tape recordings of the meetings.

During the time Franklin was provisionally classified as a Municipal Records Supervisor, which itself involved a pay increase, Franklin also received her annual merit increase in pay on August 15, 2005. Following the deletion of the "provisional" appointment, Homewood determined that plaintiff was erroneously awarded the merit increase, believing that a merit increase for the Administrative Assistant IV position was not proper while plaintiff was in a provisional classification for Municipal Records Supervisor. In late January 2006, Linda Cook directed plaintiff to see Danny Panos, Homewood's Finance Director, about repaying the City what it believed was an overpayment of plaintiff's salary after August 2005, due to the merit increase. Plaintiff met with Panos and Cook, and signed an agreement to have the alleged overpayment deducted from her paycheck. The deductions occurred in plaintiff's next paycheck, dated January 31, 2006. (See Plaintiff's Affidavit, p. 2). She was required to reimburse the City the amount of $800.80, reflecting the supposed overpayment for seven pay periods from October 1, 2005, to January 30, 2006.

Almost immediately, Franklin questioned the deduction and sought clarification both from the City and the Personnel Board.  Ultimately, on August 22, 2006, City Finance Director Danny Panos received clarification and concluded in an email to Cook that the deduction from Franklin's pay was incorrect and that "We are going to owe Joyce $1,286.13 gross for period Aug. 15, 2005 to January 31, 2006.  This will be $1,258.40 in salary and $27.73 in O/T."  Although Panos requested permission to make the payment to plaintiff, the Council president, Jennifer Busby, asked for a further explanation.  On September 13, 2006, the Personnel Board wrote a letter to the mayor of Homewood, explaining the Personnel Board rule requiring the plaintiff's pay adjustment.  (See Plaintiff's Affidavit, Exhibit 10).  Notwithstanding this clarification letter, Homewood did not reimburse Franklin for the wrongly deducted pay until September 2008, after this lawsuit commenced.  On September 25, 2008, Homewood Mayor McCulley handed the plaintiff a sealed envelope containing a letter which stated that the failure to reimburse plaintiff for the deduction in pay was an "innocent oversight."  The letter included a check for $974.77, which represented the amount of the deducted pay, minus employment withholdings.  The City did not pay any interest on the amount.  Mayor McCulley has testified that the plaintiff was not paid the reimbursement promptly due to "a mistake in the accounting department."

## III.   DISCUSSION

### Claims Against the City of Homewood

The defendant City seeks summary judgment on a long list of state and federal claims that the plaintiff paints in broad strokes in her complaint. The court already has explained, however, that

21

some of the claims addressed by the defendant are not adequately set forth in the amended complaint and will not be considered. (See Doc. #191).[7] Accordingly, the court considers the motion for summary judgment only with respect to the claims the court finds are adequately pleaded.

A.  Negligence

Reading the plaintiff's complaint liberally, there appear to be two distinct negligence theories, one of which has been fully discussed previously.  Plaintiff's two negligence claims appear to be, first, that the City negligently failed to file necessary paperwork to initiate the process by which her provisional appointment to Municipal Records Supervisor could be made permanent, and, second, the City negligently deducted from her pay in January 2006 on the erroneous belief that she had been overpaid in the provisional appointment and then negligently failed to reimburse her for the deduction once it was clear that she was not overpaid.  The latter of these theories was the subject of the plaintiff's motion for partial summary judgment that has been denied by the court.[8]

---

[7]    The court's reading of the complaint is set forth in detail in its Report and Recommendation regarding plaintiff's motion for summary judgment.  Based on the explanation therein (Doc. # 191), the only claims raised against the City of Homewood, and therefore considered to be challenged by the instant motion, are the state-law claim for negligence set forth as Count I, the equal protection and due process claims set forth as Count II, a denial of overtime pay and retaliation in violation of the Fair Labor Standards Act set forth in Count III, and a state-law breach-of-contract claim set forth in Count IV.

[8]    The undersigned concluded in the earlier report and recommendation, adopted by the court, that the claim regarding Homewood's erroneous deduction of some of Franklin's pay was not a claim sounding in negligence, but one sounding more in breach of contract.  Franklin has not sought to amend her complaint further to allege this as a breach of contract, so it remains before the court pleaded simply as a negligence claim.

The negligence claim relating to the deduction of pay in January 2006 was addressed fully in the Report and Recommendation regarding the plaintiff's motion for partial summary judgment (Doc. #191). Of course, in assessing the instant motion, the facts are viewed in the light most favorable to the plaintiff. It does not necessarily follow that, because plaintiff's motion for summary judgment on the negligence claim was denied, a motion is due to be granted in favor of the defendant. In this case, however, that is the inescapable result. The court already has determined that the duty allegedly breached — not to erroneously deduct from pay to collect a misperceived overpayment — is not the type of duty of reasonable care that gives rise to liability in tort law, and should have been (but was not) pleaded as a breach-of-contract claim.[9] (Doc. #191, pp. 14-15). Moreover, if the claim were construed as one that sounds in tort, such claim is barred by Alabama Code § § 11-47-23 and 11-47-192 (1975), which require that the plaintiff file a sworn statement of claim with the City Clerk within six months after the accrual of her tort claim.[10] Plaintiff failed to timely file her notice of claim because her claim accrued no later than January 2006, but she did not file the notice until November 2006. (See Doc. #191, pp. 16-20). Finally, to the extent it might be argued that the deduction was intentionally wrongful, the court has already explained that claims asserting Homewood's liability based upon any intentional conduct or conduct of an agent or

---

[9] It is important to understand that plaintiff has *not* pleaded the pay-deduction claim as a breach-of-contract claim, but only as a negligence claim. The court cannot now treat the claim as a breach of contract because plaintiff's complaint has not put defendant Homewood on notice that it is required to defend against that theory. Plaintiff's own motion for partial summary judgment made clear the nature of the legal theory she was pursuing, and to now treat it as a breach of contract would be to unfairly surprise the defendant. While it may be possible that this claim could have gone forward under a contract theory, plaintiff has not pleaded it or argued it that way.

[10] A full discussion of the application of these statutes to the facts in this case is set forth in the Report and Recommendation regarding plaintiff's motion for summary judgment (Doc. #191).

23

employee are due to be dismissed.  (Doc. #50, pp. 6-7).  Alabama municipalities are not liable for the intentional wrongdoing of its employees and agents, but only for their negligence or unskillfulness.

Plaintiff's other negligence theory contends that the City negligently failed to follow through on seeking to convert her provisional appointment to a permanent appointment to Municipal Records Supervisor.  This claim also is barred by Alabama Code § § 11-47-23 and 11-47-192 (1975), because she failed to file a timely notice of claim within six months after the claim accrued.  Plaintiff was provisionally appointed on January 1, 2005.  Even assuming the City's negligence did not accrue in a cause of action until she lost the provisional appointment and was returned to the Administrative Assistant IV position, that occurred in February 2006, and she did not file a notice of claim until November 2006, several months after the six-month window expired.  Again, insofar as she argues that City employees willfully or intentionally failed to seek the necessary List of Eligibles for the appointment to be made permanent, the City is not liable for the intentional wrongdoing of its employees, only their negligence or lack of skillfulness.

Accordingly, the plaintiff has failed to demonstrate that there exists any genuine issue of material fact as to her claims of negligence that requires a jury trial.  To the contrary, after a full development of the facts, no foundation in law has been established for this claim, and the defendant City's motion for summary judgment as to Count I is due to be granted.

B.   Equal Protection

When the court dismissed the plaintiff's claims alleged to arise under the "equal protection clause" of the Alabama Constitution, the court held that no such right exists under the Alabama Constitution. (See Doc. #50, p. 8).  The only equal protection claim that may be alleged, then, is one arising under the United States Constitution.  This contention also was addressed by the court in disposing of the motion to dismiss.  Plaintiff has not alleged that she has been differently treated on the basis of race or any other protected classification, and there is no evidence of such presented here.  Accordingly, the court concluded in its discussion of the motions to dismiss that her only federal equal-protection claim could be a "class of one" claim, which would require plaintiff to prove that she was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  As the defendant has pointed out, plaintiff has failed to allege or prove the existence of any such "similarly situated" employees, except to assert that one Homewood employee was allowed to work overtime when she was not.  An examination of the failure of proof, however, is not necessary here.

Defendant also has asserted that any such "class of one" claim cannot be sustained since the Supreme Court's recent opinion in Enquist v. Oregon Dept. of Agriculture, ___ U.S. ___, 28 S. Ct. 2146, 170 L. Ed. 2d 975 (2008).  The plaintiff concedes, and the court agrees.  In Engquist, an Oregon public employee sued the agency for which she worked, her supervisor, and a co-worker, alleging, *inter alia,* that she had been fired for "arbitrary, vindictive, and malicious" reasons under the "class of one" theory.  128 S. Ct. at 2149.  A jury found in her favor, and the Ninth Circuit Court of Appeals reversed, recognizing that the "class of one" theory offers protection in the legislative and

25

regulatory functions of a public entity as decided in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000), but finding that a government agency was less constrained when acting as an employer and that the class-of-one theory was "inapplicable to decisions made by public employers with regard to their employees."  128 S. Ct. at 2150, quoting 478 F.3d 985, 996 (9th Cir. 2007).  The Ninth Circuit's decision conflicted with other lower court decisions, and the Supreme Court granted *certiorari*.

The Supreme Court rejected Enguist's claim, holding:

> We do not quarrel with the premises of Engquist's argument.  It is well settled that the Equal Protection Clause "protect[s] persons, not groups," <u>Adarand Constructors, Inc. v. Peña</u>, 515 U.S. 200, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995) (emphasis omitted), and that the Clause's protections apply to administrative as well as legislative acts, see, *e.g.*, <u>Raymond v. Chicago Union Traction Co.</u>, 207 U.S. 20, 35-36, 28 S. Ct. 7, 52 L. Ed. 78 (1907).  It is equally well settled that States do not escape the strictures of the Equal Protection Clause in their role as employers. See, *e.g.,* <u>New York City Transit Authority v. Beazer</u>, 440 U.S. 568, 99 S. Ct. 1355, 59 L. Ed. 2d 587 (1979); <u>Harrah Independent School Dist. v. Martin</u>, 440 U.S. 194, 99 S. Ct. 1062, 59 L. Ed. 2d 248 (1979) (per curiam); <u>Massachusetts Bd. of Retirement v. Murgia</u>, 427 U.S. 307, 96 S.  Ct. 2562, 49 L. Ed. 2d 520 (1976) (*per curiam*).  We do not, however, agree that Engquist's conclusion follows from these premises.  Our traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as employer as opposed to sovereign, lead us to conclude that the class-of-one theory of equal protection does not apply in the public employment context.

128 S. Ct. at 250-51.  The Court's analysis centered on the common-sense principle that a government entity also had to act as an employer, charged with making the workplace operate efficiently and effectively.  The court stated:

We have long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising "the power to regulate or license, as lawmaker," and the government acting "as proprietor, to manage [its] internal operation." Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961). This distinction has been particularly clear in our review of state action in the context of public employment. Thus, "the government as employer indeed has far broader powers than does the government as sovereign." Waters v. Churchill, 511 U.S. 661, 671, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994) (plurality opinion). "[T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible." Id., at 674-675, 114 S. Ct. 1878. See also Connick v. Myers, 461 U.S. 138, 150-151, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (explaining that the government has a legitimate interest "in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service' " (quoting Ex parte Curtis, 106 U.S. 371, 373, 1 S. Ct. 381, 27 L. Ed. 232 (1882) (alterations in original))). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Waters, supra, at 675, 114 S. Ct. 1878 (plurality opinion). Given the "common-sense realization that government offices could not function if every employment decision became a constitutional matter," Connick, supra, at 143, 103 S. Ct. 1684, "constitutional review of government employment decisions must rest on different principles than review of ... restraints imposed by the government as sovereign," Waters, supra, at 674, 114 S. Ct. 1878 (plurality opinion).

In light of these basic principles, we have often recognized that government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large. Thus, for example, we have held that the Fourth Amendment does not require public employers to obtain warrants before conducting a search of an employee's office. O'Connor v. Ortega, 480 U.S. 709, 721-722, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987) (plurality opinion). See also id., at 732, 107 S. Ct. 1492 (Scalia, J., concurring in judgment). Although we recognized that the "legitimate privacy interests of public employees in the private objects they bring to the workplace may be substantial," we found that "[a]gainst these privacy interests ... must be balanced the realities of the workplace, which strongly suggest that a warrant requirement would be unworkable." Id., at 721, 107 S. Ct. 1492 (plurality opinion). We have also found that the Due Process Clause does not protect a public employee from discharge, even when such discharge was mistaken or unreasonable. See Bishop v. Wood, 426 U.S. 341, 350, 96 S. Ct.

2074, 48 L. Ed. 2d 684 (1976) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions").

128 S. Ct. at 2151-52.  In sum, the court noted that employment decisions are, by their very nature, "quite often subjective and individualized," and that treating "seemingly similarly situated individuals differently in the employment context is par for the course."  128 S. Ct. at 2154-55. Public employees, like most counterparts in the private sector, are governed by the principles of at-will employment.  The court explained:

> We long ago recognized the "settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer." McElroy, 367 U.S., at 896, 81 S. Ct. 1743.  The basic principle of at-will employment is that an employee may be terminated for a "'good reason, bad reason, or no reason at all.'" Reply Brief for Petitioner 27. See Andrews v. Louisville & Nashville R. Co., 406 U.S. 320, 324, 92 S. Ct. 1562, 32 L. Ed. 2d 95 (1972) ("[T]he very concept of 'wrongful discharge' implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will"). Thus, "[w]e have never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information."  Waters, 511 U.S., at 679, 114 S. Ct. 1878 (plurality opinion). See also Connick, 461 U.S., at 146-147, 103 S. Ct. 1684 ("[O]rdinary dismissals from government service ... are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable" (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); and Bishop, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684)). "And an at-will government employee ... generally has no claim based on the Constitution at all." Waters, supra, at 679, 114 S. Ct. 1878 (plurality opinion).  See, e.g., Bishop, supra, at 349-350, 96 S. Ct. 2074.
>
> State employers cannot, of course, take personnel actions that would independently violate the Constitution.  See supra, at 2150 - 2153.  But recognition of a class-of-one theory of equal protection in the public employment context — that is, a claim that the State treated an employee differently from others for a bad reason,

28

or for no reason at all — is simply contrary to the concept of at-will employment. The Constitution does not require repudiating that familiar doctrine.

128 S. Ct. at 2155-56. The court concluded that its finding that the class-of-one theory had no place in the arena of public employment was founded on the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." 128 S. Ct. at 2156, and would "contitutionalize the employment grievance," *id.*, quoting Connick, 461 U.S. at 154.

In the case at bar, plaintiff attempts to "constitutionalize" her employment grievance. She wants to be classified at a higher pay grade than she is, and she wants to be able to continue to work overtime whether or not her employer requests or requires it. In light of Engquist, any such claim founded on the Equal Protection Clause is not viable. Accordingly, the defendant City's motion for summary judgment on an Equal Protection claim of Count II is due to be granted.

C. Due Process

The vast majority of cases dealing with a violation of procedural due process rights[11] in the employment context arise when an employee is discharged. Resolution of such a case begins with an examination of whether that employee had a property interest in continued employment. While

---

[11] To the extent that plaintiff attempts to argue that her substantive due process rights have been violated, that claim is clearly without basis in law because the substantive component of the Due Process Clause protects only "fundamental rights" that arise from the Constitution. See, *e.g.*, McKinney v. Pate, 20 F.3d 1550, 1556 (11th Cir. 1994). At issue here is nothing more than plaintiff's employment-related interests, which are insufficient to form the foundation of a substantive due process claim.

an at-will employee generally has no such property interest, a protectible interest has been found to exist in the realm of public employment where "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).  Under the law of the Eleventh Circuit Court of Appeals, a property interest theoretically may exist in an employee's rank, as well as in his continued employment.  Ross v. Clayton County, 173 F.3d 1305, 1307 (11th Cir. 1999)(noting that a property interest in rank is at least theoretically possible, and a demotion could trigger procedural due process obligations even though the employee continues to work for the employer).  Therefore, actions such as firing or demoting an employee with such a property interest, without providing appropriate processes, may constitute a violation of the employee's procedural due process rights.[12]   It is also true, however, that there can be no property interest in rank when there is none in the underlying employment.  173 F.3d at 1310 n.8.  Otherwise, "[i]t would be anomalous to construe the personnel regulations in a way that would make it easier, insofar as constitutional protections are concerned, to fire an employee than to demote him." 173 F.3d at 1310 n.8.

_____

[12]       Although plaintiff also seems to argue that she had some due process right to receive a promotion to a higher rank, she cites no authority for such a right to be promoted, and the court finds none.  Franklin argues that she was deprived of "employment opportunities," which appear to be the opportunity to earn in the future a higher wage through promotion or by working overtime. The due process clause does not protect the speculative possibilities of the future, only presently existing liberty or property interests.

In <u>Ross</u>, a correctional officer in Clayton County, Georgia, filed suit against the county after he was demoted from the rank of sergeant.  The court examined the Clayton County Civil Service Rules governing the plaintiff's right to appeal his demotion, and found that he had no right to appeal. Accordingly, the court held, the decision to demote Ross was "not subject to review" and did not, therefore, create a property interest in the higher-ranking position.  173 F.3d at 1308-09.

The Eleventh Circuit Court of Appeals has never determined whether the Jefferson County Personnel Board Rules give rise to a protectible property interest in a specific classification, but a similar issue was raised in <u>Doyle v. University of Alabama in Birmingham</u>, 680 F.2d 1323, 1326 (11th Cir. 1982).  A salary review panel for the defendant University had recommended a raise for Doyle, but the recommendation was never adopted.  She sued, asserting, *inter alia*, that she was entitled to notice and a hearing before she was denied the recommended pay raise.  680 F.2d at 1326. The district court dismissed her procedural due process claim and the Eleventh Circuit Court of Appeals affirmed, noting that she  "had no protected property interest in the mere recommendation for a raise."  680 F.2d at 1326.  The court cited <u>Roth</u>, noting that such protection "extends only to interests *already acquired* in specific benefits."  680 F.2d at 1326 (emphasis in original).

Plaintiff argues that she had a property interest in a promotion to the classification of Municipal Records Supervisor and even to Minute Clerk[13] sufficient to support a claim under the due

---

[13]       The court need not discuss further the argument of some entitlement to the position of Minute Clerk.  Franklin has demonstrated only that there was some discussion, and at one point a recommendation, that her duties fit within the definition of that classification.  Like the plaintiff in <u>Doyle</u>, it is undisputed that the recommendation was never acted upon.  There was never any decision by the Personnel Board that Franklin be classified as a Minute Clerk, there was no provisional appointment, and there is now a consensus between the Board and the Appointing Authority that the Minute Clerk designation is not appropriate as a classification for an employee

process clause.  To find that Franklin was constitutionally entitled to the promotions, the court first must find that she had a property interest in her continued employment with Homewood.  Because there appears to be no dispute that Franklin could be terminated only "for cause," the court assumes, without deciding, that Franklin had a property interest in her continued employment.

The issue on which this motion turns is whether the plaintiff had a protectible property interest in the classification of Municipal Records Supervisor — or any specific classification or rank — as distinct from a property interest in employment.  In other words, plaintiff must have a "legitimate claim of entitlement" to the rank she seeks.  See, *e.g.*, Martin v. City of East Orange, slip op. No. 06-4293, 2009 WL 324187 (D.N.J. Feb. 9, 2009).  A protectible interest in a promotion must arise under state law rules or regulations.  Roth, 408 U.S. at 577.  A protectible property interest requires more than a "unilateral expectation of employment" and must be set forth in state law.  Warren v. Crawford, 927 F.2d 559, 562 (11th Cir. 1991) citing Roth, 408 U.S. at 577.  An employee does not have a protected property interest in the specific procedure of a promotional process, but only in the "entitlement" that stems from the procedure.  See Dowling v. Commonwealth of Pennsylvania Liquor Control Bd., 1992 WL 328840 (E.D. Pa. Oct. 27, 1992).  An employee who is probationary generally has no property interest in his employment.  See, *e.g.*, Ste. Marie v. City of Dayton, 109 F. Supp. 2d 846, 854 (S.D. Ohio 2000).

---

performing the duties performed by Franklin.  Plaintiff's insistence that the City "raged" at the Board and ridiculed Board representatives (Doc. #176, p. 20) is not relevant to whether the plaintiff had a protectible interest in the Minute Clerk position.  Whether the Personnel Board changed its view of the recommendation due to a threat or concern that Homewood might go elsewhere for its personnel services also is immaterial to whether Franklin actually ever possessed a protectible interest in the position.  Franklin simply never possessed the position of Minute Clerk.

To determine whether Franklin had a protected interest in any specific classification, the court must examine the Rules and Regulations of the Personnel Board. The Rules provide that: "The question of whether or not an employee has been assigned to the proper Class and Pay Grade shall be a matter subject to the decision of the Board." Rule 7.1. However, it is clear and undisputed that, as a *provisional* appointee to the position of Municipal Records Supervisor, the plaintiff had no "rights of status, appeal or related rights." Rule 11.3(b). As in <u>Ross</u>, the authority of the Board to determine the plaintiff's classification was "unchecked because there was no appeal right," and such authority is "tantamount to an ability to demote at will." 173 F.3d at 1309. Moreover, the Personnel Board, which has the final decision-making authority regarding pay and classification, has determined that the provisional appointment of Franklin to the classification of Municipal Records Supervisor was an error, and that her appropriate classification was Administrative Assistant IV. To find for the plaintiff under these facts would not only create a protected property interest where none exists under the law, it would create a situation in which any employer who mistakenly pays or classifies an employee at a higher rate than appropriate is forever barred from correcting the error. Franklin has failed, therefore, to demonstrate that she had a protectible property interest in her provisional appointment to Municipal Records Supervisor.[14]

The plaintiff points out that, pursuant to the applicable Rules and Regulations, a provisional appointment may be made for only four months. Rule 11.3(b). It is not clear (and neither party takes a definitive position) whether, at the end of four months, a provisional appointment becomes void,

---

[14]    To the extent that plaintiff complains of Homewood's failure to submit to the Board the paperwork to effectuate a reclassification, such a claim does not constitute a deprivation of a protected property interest. <u>Dowling</u>, 1992 WL 328840 at *5.

becomes permanent, or falls into some other category. The legal position most favorable to plaintiff would be that, after four months as a provisional Municipal Records Supervisor, Franklin's classification became permanent. The court believes, however, that such a construction of the Personnel Board Rules is contrary to purpose and structure of the rules. The purpose of the provisional appointment is to place an employee into a position temporarily until a register of eligibles for the position is created. The very core of the Personnel Board system requires hiring and promotion *only* from a List of Eligibles, or candidates who have passed an examination or otherwise demonstrated their qualification for the job. See, *e.g.*, City of Birmingham v. Lee, 48 So. 2d 47 (Ala. 1950). Even employees provisionally hired or promoted into a position must ultimately make the List of Eligibles to be considered for permanent employment. Personnel Board Rule 11.3(b) explicitly states: "Any provisional appointee who fails to achieve a score on the competitive examination placing him or her in certifiable range on the Eligibility List shall be removed from the provisional appointment after the appropriate Eligibility List is established." It seems clear that a provisional employee cannot become permanent merely by the passage of time. The more accurate construction of the four-month rule, therefore, would seem to be that if, upon expiration of the four-month provisional appointment, the employee has not made it onto the List of Eligibles for the position, she either loses the appointment or reverts to her previously held classification.

This construction is further bolstered by Personnel Board Rule 11.6. Under that rule, an employee who is reclassified is employed in the newly classified position on a probationary basis for one year. Rules 1.3, 11.6(b). During that probationary year, an employee may be "dismissed, demoted, or suspended without the right to appeal." Rule 11.6(b). Upon such demotion, the

34

employee may return to the position held prior to the promotion.  Rule 11.6(c).  There is no right to appeal such a demotion.  Rule 11.7.  While this does not speak to provisional appointments as such, it does demonstrate that permanent appointment to a classified position can be achieved only through getting on a register of eligible candidates, and, if that does not occur, the affected employee returns to her previous classification.

The Rules and Regulations, viewed as a whole and in the context of the facts, make clear that plaintiff's classification is a matter within the purview of the Board, and about which the Board is given discretion.  Classification decisions, which include promotions and demotions,[15] are not appealable.  Accordingly, any failure to reclassify the plaintiff to any specific position cannot constitute a violation of procedural due process.  A provisional appointment that expires under the four-month rule simply expires; it does not blossom into a permanent classification.  Here, under Board Rules, the provisional appointment to Municipal Records Supervisor appears to have expired at the end of April 2005, and Franklin effectively reverted to her Administrative Assistant IV classification.

Even assuming for the sake of argument that Franklin achieved some protectible interest in either the Municipal Records Supervisor or Minute Clerk positions, she was not deprived of procedural due process of law because state law provided her with a procedure for challenging any deprivation of these classifications.  Franklin admits that she could seek a remedy under Board Rules

---

[15]    It is an overly generous reading of the evidence to categorize the action as a demotion.  The facts more accurately depict a failure to promote.  The Board decided as much when Lorren Oliver, director of the Personnel Board, informed Franklin that the act of "placing you back in your original position would not be considered a demotion [but] rather a legitimate management decision to end the provisional appointment."  (Defendants' Joint Submission, Ex. 32).

for the loss of a protected classification, and, indeed, Alabama law allows such an employee to seek

a judicial remedy.  See, e.g., Henderson v. Arrington, 392 So. 2d 806 (Ala. 1980) (holding employee

may seek declaratory judgment voiding a municipal employment rule in conflict with a Personnel

Board Rule); McMahan v. Yeilding, 120 So. 2d 429 (Ala. 1960) (demoted employee may seek

*certiorari* review of Personnel Board action by circuit court).  When state law provides a remedy by

which an aggrieved person may seek relief from the deprivation of a property interest, there has been

no denial of process.  See Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 538, 68 L. Ed. 2d 420

(1981); see also Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984).  Earlier

this year, in Reams v. Irvin, 561 F.3d 1258 (11ᵗʰ Cir. 2009), the court of appeals reiterated this settled

principle:

> It is well-settled that a constitutional violation is actionable under § 1983 "only when
> the state refuses to provide a process sufficient to remedy the procedural
> deprivation." McKinney v. Pate, 20 F.3d 1550, 1557 (11ᵗʰ Cir. 1994) (*en banc*); see
> also Foxy Lady, Inc. v. City of Atlanta, 347 F.3d 1232, 1238 (11ᵗʰ Cir. 2003)
> ("[E]ven if a procedural deprivation exists ..., such a claim will not be cognizable
> under § 1983 if the state provides a means by which to remedy the alleged
> deprivation."); Cotton, 216 F.3d at 1331 ("It is the state's failure to provide adequate
> procedures to remedy the otherwise procedurally flawed deprivation of a protected
> interest that gives rise to a federal procedural due process claim.").  In Cotton, we
> observed that
>
>> [t]his rule (that a section 1983 claim is not stated unless inadequate
>> state procedures exist to remedy an alleged procedural deprivation)
>> recognizes that the state must have the opportunity to remedy the
>> procedural failings of its subdivisions and agencies in the appropriate
>> fora-agencies, review boards, and state courts before being subjected
>> to a claim alleging a procedural due process violation.
>
> Cotton, 216 F.3d at 1331 (quotation marks omitted); see Horton v. Bd. of Co. Com'rs
> of Flagler Co., 202 F.3d 1297, 1300 (11ᵗʰ Cir. 2000) (no federal procedural due
> process violation under McKinney if state courts "generally would provide an

adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered").

Id. at 1266.  Because Alabama state law provides a remedy by which a classified employee can seek relief from the deprivation or loss of a classified position, there is no denial of constitutional due process of law, and the City's motion for summary judgment is due to be granted on this ground as well.

The City's motion for summary judgment on any claim premised on the Due Process Clause of the Alabama or federal Constitution is due to be granted.

E.  Fair Labor Standards Act

The court has concluded that plaintiff has raised two claims in Count III arising under the Fair Labor Standards Act ("FLSA"): (1) that she worked overtime hours for which she was not compensated by Homewood in violation of 29 U.S.C. § 207(a)(1), and (2) that Homewood retaliated against her in violation of 29 U.S.C. § 215 (a)(3) for complaining that she was entitled to overtime and should be placed in a higher-paying job classification.

1.  Unpaid Overtime

The defendant City of Homewood seeks summary judgment in its favor on the FLSA overtime claims based on the plaintiff's failure to document the exact number of overtime hours she worked.  At the very least, however, Franklin has stated that she worked an estimated 113 hours of

overtime at home, transcribing minutes of the Homewood City Council meetings.[16]  She further asserts that her supervisor and the City Council knew and tacitly approved of the overtime work. Plaintiff points to her letter of May 2004 to Cook, in which she stated that she had so much work she had to transcribe Council meeting minutes at home,[17] as evidence that her supervisor was aware of her overtime.  Likewise, she also relies on her February 2006 letter to Council President Ginger Busby as proof that the Council itself was aware of her overtime.[18]  These assertions create a genuine issue of material fact that must be decided by a jury.[19]  Accordingly, the City's motion for summary judgment as to her claim for unpaid overtime under the FLSA included in Count III is due to be denied.

---

[16]     Defendant's argument that Franklin's failure to provide "written documentation" of the number of hours she spent working overtime goes to the extent of damages, and not to the threshold burden of proving that the City violated the FLSA.  Although plaintiff has the burden of proving the existence and extent of overtime worked, a jury could believe Franklin's testimony about the number of hours she worked.  The court does not find that such a showing is, as a matter of law, insufficient to meet plaintiff's burden.

[17]  In part, the May 2004 letter to Cook states, "I won't belabor you with my workload. Suffice it to say that I have so little time on my job to do Council minutes that following any given Council meeting, you will probably find me at my kitchen table doing them at home."

[18]  Plaintiff's February 24, 2006, letter to Busby states in part, "I also continued to do the work for the Council with the minutes preparation.  Additionally, I continued to do many other assignments at the office and found that I had to work many hours at home in order to complete the minutes, which also continued to be assigned to me.  I have reported all of this in the past to my supervisor, Linda Cook."

[19]     Although the City argues that Franklin's FLSA retaliation claims are barred by the statute of limitation, it does not make that argument with respect to the unpaid overtime claim.

2. FLSA Retaliation

The defendant City also seeks summary judgment in its favor on plaintiff's claim that the City retaliated against her in violation of the FLSA after she complained about unpaid overtime and her job classification. The FLSA prohibits an employer from discriminating against an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). To establish a *prima facie* showing under the FLSA anti-retaliation provision, a plaintiff must show that: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and, (3) a causal connection existed between the employee's activity and the adverse action." Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000), quoting Richmond v. ONEOK, Inc., 120 F.3d 205, 208-09 (10th Cir. 1997). Like in a Title VII case, if the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. 200 F.3d at 1343.

An activity protected under the FLSA may include both official and unofficial complaints alleging an FLSA violation. Not every expression of displeasure about wages, however, constitutes a complaint protected under the Act. Casey v. Livingston Parish Communications Dist., 2009 WL 577756 (5th Cir. 2009)(oral complaint about delays in payment of overtime not a protected activity); Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617 (5th Cir. 2008)(questions about a change that would reduce overtime not a "protected activity"). "Abstract grumblings" or "vague expressions of discontent" do not constitute a protected activity: the informal complaint must not only concern a subject protected under the FLSA, but also must directly dispute the legality of the action about which the employee is complaining. Hagan, 529 F.3d at 626; Hardwick v. Complete Skycap

39

Services, Inc., 247 Fed Appx. 42 (9th Cir. 2007)(rejecting FLSA claim where plaintiffs had "generally complained" about salaries and the tipping allocation system, but had not asserted that the employer had violated the law). The Eleventh Circuit Court of Appeals has noted that a complaint under the FLSA may be construed broadly, but so held when the subject of the plaintiffs' complaints had been "about" the alleged FLSA violation. E.E.O.C. v. White and Son Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989)(women had asked supervisor when they did not receive the same raise as the men and specifically requested equal pay); see also Keeler v. Florida Dept. of Health, slip op. No. 08-14170, 2009 WL 1111551 (11th Cir. April 27, 2009). Letters complaining about work conditions are not sufficient unless they make "specific mention of overtime pay or invoke the FLSA." Alvarado v. I.G.W.T. Delivery Systems, Inc., 410 F. Supp. 2d 1272, 1279 (S.D. Fla. 2006). At least one appellate court has found that the FLSA limits protected activities to complaints placed in an external administrative or judicial arena, and excludes from protection any "internal" complaints. Whitten v. City of Easley, 62 Fed. Appx. 477, 480 (4th Cir. 2003); but see Williamson v. General Dynamics Corp., 208 F.3d 1144, 1152 (9th Cir. 2000). Clearly, the FLSA is not to be read as broadly as the anti-retaliation provisions of Title VII, which Congress drafted broadly to prohibit discrimination triggered when an employee "opposed any practice" made unlawful by Title VII. See Ball v. Memphis Bar-B-Q Co., 228 F.3d 360, 364 (4th Cir. 2000); Wigley v. Western Florida Lighting, Inc., 2005 WL 3312319 (M.D. Fla. 2005)(protected activity under the FLSA is more narrowly defined than that under Title VII).

In the instant case, the court need not determine whether an informal, internal complaint is sufficient to trigger the anti-retaliation provision of the FLSA. The question here, as in Hagan, is

whether Franklin made any complaint *about* her alleged unpaid overtime before she encountered the actions she describes as retaliatory. Plaintiff's brief does not specifically allege what conduct by Franklin constituted a complaint, but does refer repeatedly to a letter Franklin wrote to Cook on May 18, 2004. (Defendants' Joint Submission, Ex. 11). It is clear from Franklin's deposition that she relies upon the letter as "notice" to Homewood of her working overtime. (Franklin Depo., pp. 300-313).[20] She admits she never submitted a request for payment or made any claim for overtime pay. (Franklin Depo., p. 304). Franklin's single-spaced, three-page letter makes no mention of overtime, the FLSA, or any "illegal" activity. The gist of the letter is to protest criticism she received from her supervisor about "errors" committed by Franklin. The sole mention of what she now claims was unpaid overtime is her statement: "I won't belabor you with my workload. Suffice it to say that I have so little time on my job to do Council minutes that following any given Council meeting, you will probably find me at my kitchen table doing them at home." (Defendants' Joint Submission, Ex. 11, p. 2).

The court finds that her "vague grumblings" about working at her kitchen table were not sufficiently specific to put the defendant City on notice that she was alleging that it had violated the FLSA in failing to properly pay overtime wages.[21] While an informal, internal complaint may be

---

[20]    While Franklin complains that Cook once saw her at work before her scheduled time to start, it is clear that Cook told her "not to come in early anymore." (Franklin Depo., p. 306).

[21]    Plaintiff also alleges that she wrote city officials in the spring of 2006 to report that her workload was such that she had to work at home to complete the task of transcribing minutes. This letter, however, was written months after the City made a determination, and informed Franklin, that no overtime would be available in fiscal 2006. To the extent that Franklin continued to work overtime after she had been informed that no overtime would be approved cannot now be considered actionable under the FLSA. To find otherwise would give employees authority to decide when and how much overtime to accrue, regardless of whether the employer authorized, or even desired, that

sufficient to trigger the anti-retaliation provision, a complaint about another subject matter — in this case her unhappiness about a discussion with a superior that her work had not been error-free — does not constitute the filing of "any complaint" under 29 U.S.C. § 251(a)(3).  Moreover, Franklin has stated that she "didn't complain" about the alleged unpaid overtime at the time she was working it, and that she "didn't want to complain."  (Franklin Depo., pp. 633-35).[22]  The letter of May 18, 2004, therefore, does not constitute a "protected activity" under the FLSA on which a retaliation claim can be built.  As there is no other evidence that Franklin engaged in any FLSA-protected activity,[23] she has failed to establish a requisite element of her claim.

Plaintiff argues that Cook "withdrew her support" for Franklin's reclassification as a Minute Clerk, and that the withdrawal of support was retaliatory.  (Franklin Depo., pp. 399-400).  This argument is without merit.  As discussed above, it overlooks the fact that Franklin cannot show that she engaged in FLSA-protected activity for which the withdrawal of support was retaliatory.

---

certain tasks be performed as overtime.  While the FLSA requires that employees be compensated for overtime they are required to work, the FLSA does not give workers the authority – much less unfettered authority – to decide the number of overtime hours they will work.

[22]    To the extent that plaintiff further asserts that the "loss of overtime opportunities" in 2006 was retaliatory, this claim is without basis.  Franklin has admitted that overtime was not budgeted in 2006 due to budget restrictions, and that the budget was put into place in October 2005, well before Franklin wrote her second letter in 2006.  While she makes some allegations that other employees were allowed to work overtime, she points only to one security guard (Franklin Depo., p. 311), James Sharbutt, who works for the Mayor's Office, and not the City Clerk's office, as does Franklin.  Plaintiff cannot argue that she and Sharbutt are similarly situated employees.

[23]    Franklin asserts also that she was subjected to retaliation because she complained about her job classification and the City's refusal to promote her to Municipal Records Supervisor or Minute Clerk.  Clearly, however, protesting these actions is not a protected activity under the FLSA and cannot serve as a basis for an FLSA retaliation claim.  The FLSA does not protect or mandate any job classifications or promotions.

Pursuing a certain job classification under the Jefferson County Personnel Board Rules does not come within the protected activities of the FLSA. But even assuming for the sake of argument that it supports an FLSA claim, the undisputed evidence demonstrates that the Personnel Board, although making a preliminary finding regarding that classification, never reclassified Franklin as a Minute Clerk. Cook's "support" for a classification was not the cause of Franklin's classification as an Administrative Assistant IV.[24] Plaintiff further argues that the defendant retaliated by reducing her job duties or requiring her to change her work hours. This argument belies plaintiff's own allegations that she had too many duties to be performed within a 40-hour week, and that she should be able to attend City Council meetings at night. Clearly, the plaintiff complained that she was overwhelmed with work, but now wants to complain that the City responded by taking away some of that work. It further is undisputed that the change in plaintiff's work schedule was made to allow her to attend Council meetings or transcribe minutes without having to put in overtime hours on those days. These actions cannot be deemed retaliatory since they were invited by plaintiff's own complaints. It has long been established in the Eleventh Circuit Court of Appeals that a court "should not act as a 'super-personnel department' by questioning an employer's business judgment about where it assigns employees." Shannon v. Bellsouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002). Plaintiff's complaints about having to work a variable schedule, or having certain duties reassigned to others, fall within Homewood's reasonable exercise of business

---

[24]     Indeed, in her February 24, 2006, letter to the Homewood Council president, Franklin stated that her supervisor supported her reclassification to Minute Clerk. She wrote, "The Finance Committee vote on Tuesday to drop the Minute Clerk position altogether was most unexpected, especially in light of both Personnel Board approval and *my supervisor's support and confirmation to me that the position was merited*." [Emphasis added].

judgment as an employer, particularly where they appear to be solutions to job complaints raised by Franklin herself.

Accordingly, plaintiff has failed to meet her burden of proving a *prima facie* case of retaliation under the FLSA, and the defendant City is entitled to summary judgment in its favor on the retaliation claim in Count III against it.

### F.  Breach of Contract

Plaintiff asserts that the City breached its contractual obligations to her by failing to pay overtime or compensatory time in accordance with the City's Employee Handbook, and to classify and pay plaintiff according to the Personnel Board's Rules and Regulations.  (Plaintiff's brief, Doc. #176, p. 23; Employee Handbook, Pl.'s Ex. 2, pp. 2, 49-50).[25]  Plaintiff further alleges that the City retaliated against her in violation of its own rules against retaliation.  Relying on, *inter alia*, Morrow v. Town of Littleville, 576 So. 2d 210 (Ala. 1991), plaintiff asserts that the handbook, when given to an employee who then continues to work for the defendant, modifies the at-will relationship to create a type of an employment contract.  Plaintiff contends that the Personnel Board's actions in provisionally classifying her as a Municipal Records Supervisor, and at least recommending for a time that she be classified as a Minute Clerk, created contractual obligations that the City failed to perform because it is obligated to comply with the classification and pay rules and regulations of the

---

[25]        Although earlier pleadings indicated to the court (and, apparently, to defendants) that the contract relied upon was one between the City and the Board to which plaintiff asserted she was a third-party beneficiary, her brief filed in opposition takes the position that plaintiff was a party to a contract with the City created through the City's Employee Handbook.

Personnel Board. She argues that, under the Enabling Act, the Rules and Regulations of the Personnel Board constitute terms and conditions of the employment contract between a classified employee and the municipal employer. Finally, Franklin also has referred to a statement made by Cook when she began working for Homewood. Cook told Franklin in 1999 that there is "no shortage of overtime" at the City offices. Although her opposition to the motion for summary judgment does not seem to rely on this oral statement, the defendant moves for summary judgment as to any claim for breach-of-contract premised on that statement.

In order to prevail on a claim of breach-of-contract under Alabama law, the plaintiff must demonstrate: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Employees' Benefit Association v. Grissett, 732 So. 2d 968 (Ala. 1998). Where a handbook may create a contract, the language must be "specific enough to constitute an offer," the offer must have been "communicated to the employee by issuance of the handbook," and the employee "must have accepted the offer" by staying employed after learning of the offer. Morrow, 576 So. 2d at 213; see also Ex parte Graham, 702 So. 2d 1215, 1217 (Ala. 1997).

It is the first element the plaintiff has failed to provide evidence of in this case. Plaintiff refers to the Employee Handbook, a copy of which is attached as Exhibit 2 to her submission in opposition to the City's motion for summary judgment. The handbook is dated January 1, 2008. There is no evidence that the handbook was in effect at any time prior to 2008. Moreover, there is no evidence that plaintiff received the handbook, or that the offer was communicated to her prior to 2008. Although there is passing testimony that City employees recently trained on the "new

handbook," there is no evidence concerning the contents of any earlier handbooks. The court cannot

infer that, because some provision exists in the January 1, 2008, handbook, it also existed in earlier

versions, if any. Some evidence must be presented to show that the language of the handbook was

"specific enough to constitute an offer."

Furthermore, as the defendant points out, the plaintiff has failed to submit the portion of the

2008 handbook that contains the following disclaimer:

> This Handbook does not create a contract of employment, either expressed or
> implied. The purpose of this Handbook is to serve as a general statement of the
> policies, rules and procedures of the City of Homewood. The City Council reserves
> the right to unilaterally modify, revoke, suspend, terminate or change any of the
> policies, rules and procedures in this Handbook at any time with or without prior
> notice.

(Ex. A to Defendant's Motion to Strike, Doc. #178). Under Alabama law, an employee handbook

that "contains express disclaimers" which allow the employer to "deviate" from the policies set forth

in the handbook does not constitute an offer to create a binding employment contract. Harper v.

Winston County, 892 So. 2d 346 (Ala. 2004). Such language is "sufficient to negate the inference

that the handbook constituted ... a binding employment contract." Smith v. Housing Authority of

City of Prichard, 2007 WL 735553 (S.D. Ala. 2007). The language of the Homewood handbook

makes it clear that the City had no intention of offering a binding employment contract through the

handbook. Moreover, there is no evidence that plaintiff relied on the handbook (even if it existed

in some form) when she accepted employment at Homewood or at any time before 2008. She

testified in her deposition that she based her reliance regarding overtime on Cook's oral statement

46

that there would be "no shortage" of overtime.  Plaintiff had not mentioned any reliance on the handbook until she filed her opposition to the motion for summary judgment.

Plaintiff's assertion that Cook made an oral contract with plaintiff on behalf of the City is not worthy of a lengthy discussion.  Cook's oral statement cannot constitute an enforceable contract of employment because the statement does not constitute a contract offer.[26]  The statement is too vague and ill-defined to constitute an offer to plaintiff that she may work as much overtime as she likes.  It is simply an observation of the conditions then existing.[27]

Plaintiff further has set forth some amorphous claim that she was entitled to "overtime opportunities."  She has never pinned down any legal theory under which this claim may be viable.  To the extent, however, that she claims that the City has some contractual obligation to provide her with opportunities to work overtime hours, the claim is clearly without basis in fact or law.

Accordingly, there is no genuine issue of material fact as to whether the City breached any oral contract with plaintiff.  Similarly, any argument that the breach arose from a failure to classify

---

[26]     Cook's statement would more properly be characterized as a description of fact existing in 1999, but guarantees nothing about the future.

[27]     Defendant also argues that the statement, even if it constitutes a contract provision, is barred by Alabama's Statute of Frauds.  Ala. Code  § 8-9-2(1) (1975).  The court is skeptical of this in light of Kitsos v. Mobile Gas Service Corp., 404 So. 2d 40 (Ala., 1981), where the Alabama Supreme Court held that, because a "permanent or lifetime" employment contract is *capable* of being performed within a year (*e.g.*, the employee dies within the first year), the oral contract for lifetime employment is not void under the Statute of Frauds.  The same would seem true here.  If Franklin terminated her employment less than one year after being hired, the contract to provide unlimited overtime as long as employed is not void under the Statute of Frauds.  The court need not decide this issue, however, because it is convinced that the mere statement that "there is no shortage of overtime in this office" is not a contract offer or provision, but simply a factual observation, no more binding as a promise than if Cook had said, "the sky is blue."  This cannot constitute a contract promise that the sky will always be blue during the employee's employment.

47

the plaintiff as a Municipal Records Supervisor or Minute Clerk is without basis because the facts demonstrate that the plaintiff's proper classification, as determined by the Personnel Board pursuant to its rules and function, is that of Administrative Assistant IV, and that any recommendation regarding a higher classification was made in error. Mere recommendations, never adopted or acted upon by the City,[28] do not create a contract. The motion for summary judgment on any claims arising from the breach of any oral contract, or from a failure to re-classify the plaintiff, is due to be granted. To the extent, however, that plaintiff claims that the City breached a contract to pay her overtime based upon obligations arising under the Rules and Regulations of the Personnel Baord,[29] the motion for summary judgment as to the breach-of-contract claim set forth in Count IV is due to be denied.

---

[28]    Even though the City officially adopted the 2003-2004 survey that resulted in plaintiff being provisionally reclassified as a Municipal Records Supervisor, the reclassification was subject to the provisional appointment rules of the Personnel Board, under which the provisional appointment expired after four months, and plaintiff reverted to her former position as Administrative Assistant IV. The City did not breach any contract of employment because the contract itself contained the Board rules regarding the time limit for provisional appointments.

[29]    To be clear, the only breach-of-contract claim for which summary judgment is not appropriate in favor of the defendant City is one regarding compensation for overtime allegedly worked by plaintiff. Such a claim is essentially identical to the claim for unpaid overtime brought pursuant to the FLSA, the only difference being the legal foundation for the claim. As the Personnel Board Rules constitute terms of the employment contract between a classified employee and the Appointing Authority, a provision in the Rules requiring the payment of overtime creates a contract to do so. Rule 13.11 of the Personnel Board Rules essentially adopts the FLSA as the standard governing overtime, saying simply, "If an employee is not exempt from the FLSA, the employee shall be compensated in compliance with the FLSA." Thus, the state-law breach-of-contract claim is indistinguishable from the overtime claim under the FLSA.

Claims Against Linda Cook, Individually

At the outset, it should be clear that any claims pleaded against defendant Cook in her official capacity as City Clerk have been treated as claims against the City of Homewood. The court concentrates here on Franklin's claims against her in her individual capacity. In addition to moving for summary judgment, Cook seeks an award of attorneys' fees, expenses, and costs pursuant to Rule 11 of the Federal Rules of Civil Procedure, § 1988, and/or the Alabama Litigation Accountability Act.[30]

As further explained by the court in Document #191,[31] the plaintiff's rambling and convoluted amended complaint sets forth only a few claims that can be considered legally viable. The only claims which could be construed as involving defendant Linda Cook individually are: (1) claims asserting deprivations of constitutional rights brought pursuant to § 1983 in Count II; (2) claims asserting intentional interference with contract, business relationships, or economic opportunities as set forth in Count III;[32] and (3) state-law claims of breach of contract and some form of retaliation.

---

[30]    The court reserves ruling on the motion as to an award of fees and costs. Plaintiff has not submitted any argument relating to the award of such fees.

[31]    While plaintiff's counsel filed objections to the Report and Recommendation, she did not object to the court's identification of claims and did not assert that she has any claims not identified therein by the court.

[32]    Count III has been construed as one asserting claims based on the Fair Labor Standards Act. There is no question that Linda Cook individually is not an employer within the meaning of the FLSA and, therefore, is not a suable entity. Welch v. Laney, 57 F.3d 1004, 1011 (11th Cir. 2004). This same reason precludes any personal liability under the Jefferson County Personnel Board Rules in that Cook was not the "Appointing Authority," Homewood was.

A.  Qualified Immunity

Defendant Cook seeks summary judgment in her favor on plaintiff's claims asserting a deprivation of constitutional rights brought pursuant to § 1983, asserting, *inter alia*, that she is entitled to qualified immunity.   Plaintiff has asserted that Cook failed to raise the immunity in her answer, but that issue was decided by this court's order allowing certain amended pleadings, including Cook's untimely answer.  (Doc. #187).[33]

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and are through means that are within the official's authority to utilize.  Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir. 2004), quoting Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994).  Furthermore, it is the general rule that qualified immunity will protect government actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.  Harris v. Board of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).  Even so, qualified immunity does not apply in those instances where the case law clearly establishes that the conduct alleged was a violation of the

---

[33]    Plaintiff sought review of that Order by a District Judge, and the Order was affirmed by the Honorable L. Scott Coogler on May 22, 2009.

plaintiff's constitutional rights. "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Vinyard v. Wilson, 311 F.3d 1340, 1350 (11ᵗʰ Cir. 2002) (quoting Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). "In making this inquiry, 'the salient question ... is whether the state of the law ... gave [defendants] fair warning that their alleged [conduct] was unconstitutional.'" Cottone v. Jenne, 326 F.3d 1352, 1359 (11ᵗʰ Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002)).

The initial burden of demonstrating that the public official acted within the scope of her position lies with the defendant asserting the defense. Holloman, 370 F.3d at 1264. The test is not whether the defendant had the authority to effectuate an illegal act, but whether her job entailed engaging in the act in general. See 370 F.3d at 1266. In other words, the court simply asks whether making decisions or implementing policies with regard to Franklin's employment was within the general scope of Cook's duties as City Clerk. The answer, of course, is in the affirmative.

Once the defendant has met that burden, as defendant in this case has, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. 370 F.3d at 1264. To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." 370 F.3d at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

Turning to the instant case, plaintiff has failed to offer any argument or evidence as to what federal constitutional right Cook, individually, is alleged to have violated, or to point to any law

51

which "clearly established" any right. Instead, plaintiff merely reargues that defendant Cook should not be allowed to assert the defense because her answer was untimely; however, that question will not be relitigated for a third time here. Furthermore, plaintiff has failed to demonstrate the violation of a constitutional right to due process or equal protection. As discussed above with respect to the City of Homewood's motion for summary judgment, such claims are due to be dismissed because plaintiff cannot rely on a "class of one" equal protection theory and because she has received all process to which she is due. Her claims cannot invoke the doctrine of substantive due process (because they do not involve fundamental constitutional rights), and the law of Alabama provides her with adequate post-deprivation remedies for purposes of procedural due process. There simply is no federal constitutional right implicated by Cook's conduct. Retaliation provides no theory for recovery unless it is shown that the reprisal was in response to Franklin's constitutionally protected activities. See Clark v. Alabama, 141 Fed. Appx. 777, 789 (11th Cir. 2005); Akins v. Fulton County, Ga., 420 F.3d 1293 (11th Cir. 2005)("For a public employee to establish that an employer conditioned her job in a way that burdened a constitutional right impermissibly, 'the employee must first demonstrate that the asserted right is protected by the Constitution and that he or she suffered an "adverse employment action" for exercising the right.'")(quoting McCabe v. Sharrett, 12 F.3d 1558, 1562 (11th Cir. 1994)). That simply is not shown here. Franklin has not identified any constitutional activity she engaged in that was the seed of Cook's alleged retaliation. Complaining about her job classification, and even about unpaid overtime, do not implicate the First Amendment in the public employment context, and cannot support a claim of constitutional retaliation.

The mere fact that Franklin seems to argue that Cook harbored some personal hostility against her after she wrote the May 18, 2004, letter does not change the analysis. Qualified immunity is too important a right of public servants and too important a public policy to be nullified by plaintiff's allegations that Cook "withdrew support" for Franklin because Franklin wrote a letter that mentioned that she had been working nights at home.[34] It is undisputed that, even if Cook was motivated in part by some hostility toward Franklin for her letter, an objective analysis leads to the conclusion that a reasonable public official in Cook's position could withdraw support for Franklin's reclassification to Municipal Records Supervisor and/or Minute Clerk, and further could fail to complete paperwork or to decline to authorize overtime work.[35] Cook does not lose her qualified immunity merely because she also developed a personal dislike of Franklin.

For all of these reasons, defendant Cook is entitled to qualified immunity that shields her from liability in her individual capacity from the § 1983 claims asserted by plaintiff. Accordingly, the motion for summary judgment as to the claims set forth in Count II is due to be granted.

B. Tortious Interference

Count III of plaintiff's amended complaint has been construed as alleging a claim against Linda Cook in her individual capacity for the tort of intentional interference with business relations. As best the court can figure, plaintiff asserts that Cook interfered with Franklin's employment

---

[34] The letter is contained at Defendants' Joint Submission, Ex., 11, and is set forth in full and discussed more fully *supra*.

[35] This is especially true where the reclassifications were ultimately found to be inappropriate by both the Board and the City, and where overtime was severely restricted by the City for budgetary reasons.

contract and business relationship with the City of Homewood and/or the Personnel Board. Such a claim may exist under Alabama law, and requires a showing that the defendant knew of the business relationship or contract, intentionally interfered with the relationship, and damaged the plaintiff as a result. See generally Morrow v. Auburn University at Montgomery, 973 F. Supp. 1392, 1409 (M.D. Ala. 1997).

What plaintiff seems to miscomprehend, however, is the severe limitations placed upon such a tort action. First, it has been noted that "[w]hen the named defendant is an employee or officer of a corporation or employer with a contractual or business relationship with plaintiff, as oppose[d] to the entity itself, the individual defendant may be subject to liability for tortious interference only if he acted outside the scope of his employment and acted with actual malice at the time of his alleged interference." 973 F. Supp. at 1409-10, citing Hickman v. Winston County Hosp. Bd., 508 So. 2d 237, 239 (Ala. 1987). A tortious interference claim "will not lie against an employee or officer for conduct within the general range of [her] authority which [she] exercises for the benefit of the employer." 973 F. Supp. at 1410. As Cook has pointed out, plaintiff acknowledges that Cook was acting in her capacity as the City Clerk in all the actions made the subject of the complaint. (Franklin Depo., Defs.' Joint Submission, Ex. 1, pp. 128-129). An employee will be liable for such conduct only where she "abandons" the employer's business in a "very marked and unusual" manner. 973 F. Supp. 1410, quoting Prosser v. Glass, 481 So. 2d 365, 368 (Ala. 1985). Such a departure from the employer's business has been held to occur in situations like sexual harassment, where the employee is seeking to obtain a "personal benefit," Pegram v. Hebding, 667 So. 2d 606, 701-02 (Ala. 1995).

54

In this case, there has been no allegation that Cook sought any personal benefit by declining to authorize overtime for Franklin, or by failing to implement or support promotions. To the contrary, it is clear through the testimony of the plaintiff that all of the actions of Cook about which plaintiff now finds fault were actions taken by Cook as the City Clerk and for the benefit of her employer, Homewood. Accordingly, the plaintiff has failed to demonstrate the existence of any genuine issue of material fact as to any tortious interference by Cook individually, and defendant Cook's motion for summary judgment on that claim is due to be granted.[36]

### C.  Breach of Contract and Retaliation

Plaintiff attempts to state a claim against Cook, individually, for both breach of contract and some amorphous claim of retaliation. Without repeating the court's previous analysis of the shortcomings of such claims, even when stated by Franklin against her employer, the City of Homewood, the court notes that plaintiff has conceded that she had no contract with Cook individually. The only contract matter she even alleges existed between her and Cook was an alleged oral contract created from Cook's statement in 1999 that there was "no shortage" of overtime in the City Clerk's offices, and even this was purportedly made by Cook in her official capacity as the representative of Homewood, not individually. The court has discussed why this statement did not create any contract, and it certainly was not a contract between Cook individually and Franklin.

---

[36] Any claim that Cook tortiously interfered with the alleged contract of employment also must be dismissed because, under Alabama law, a party to a contract cannot interfere with that contract; such tortious actions create liability only in a "stranger" to the contract. Rogers & Willard, Inc. v. Harwood, 999 So. 2d 912, 926 (Ala. Civ. App. 2007).

Cook's motion for summary judgment on any breach-of-contract claim clearly is due to be granted.

As to any claim that Cook retaliated against the plaintiff, the court also has explained that the only basis for such a claim under the facts of this case exists pursuant to the FLSA. No other alleged retaliation by Cook involved any statutorily or constitutionally protected activity. The only proper defendant for such an FLSA retaliation claim is the employer, which clearly is not Cook in her individual capacity. <u>Welch v. Laney</u>, 57 F.3d 1004, 1011 (11th Cir. 1995)(finding that a public official sued in his individual capacity under the FLSA is not an employer for purposes of the Act). Likewise, the only proper defendant for a claim under state law or the Personnel Board Rules or the Enabling Act is the Appointing Authority and employer, the City of Homewood, not Cook personally. The Rules themselves provide at Rules 15.1 and .2 that a classified employee may seek relief from retaliation by the employer or the employee's "supervisor" by filing a grievance against the Appointing Authority, not the offending supervisor.[37] Accordingly, Cook's motion for summary judgment as to any state-law claims set forth in Claim IV of the complaint also is due to be granted.

Claims Against the Jefferson County Personnel Board

The only claim the plaintiff's amended complaint sets forth against the Personnel Board is a deprivation of procedural due process brought pursuant to § 1983 in Count II. Plaintiff asserts that

---

[37]    Insofar as Franklin argues that she suffered retaliation in violation of the Personnel Board Rules, it is undisputed that she has never filed a grievance with the Personnel Board alleging retaliation by her supervisor as a claim against Homewood as her Appointing Authority.

she was deprived of any process by which she could grieve or appeal the Board's decisions regarding her pay and classification.[38]

A.  Judicial Immunity

The defendant Board asserts that it is entitled to judicial immunity for any acts about which plaintiff complains, based upon a court order appointing Ronald Sims as Receiver of the Board in connection with a civil contempt citation for failure to comply with orders arising from a Consent Decree.  The order appointing the receiver in United States v. Jefferson County Personnel Board, 2:75-CV-666-CLS, names Sims as receiver and gives him "all powers vested by [the Enabling Act] in the three members of the Personnel Board and Personnel Director." (Case No. 2:75-CV-666-CLS, in the United States District Court for the Northern District of Alabama, Doc. #935).  The order further vests Sims with "the status of an officer and agent of this Court," and grants "such immunities as by law vested with this Court."

The immunity granted by the order appointing the receiver was examined in Henry v. Jefferson County Personnel Board, 519 F. Supp. 2d 1171 (N.D. Ala. 2007).  In Henry, an employee of the Board filed an action alleging age discrimination, asserting that she was demoted and terminated as part of a reduction in force because of her age.  The issue of whether the Personnel

_____

[38]    In her opposition to the motion for summary judgment, plaintiff asserts at length that the Board failed to properly enforce the Enabling Act by somehow compelling Homewood to "pay her more money."  To the extent that this states a claim at all, it appears to be a claim for payment of overtime or for reimbursement for the deductions taken from her pay.  Such claims can only lie against the entity responsible for paying plaintiff: her employer, the City.

Board could be subject to liability for employment decisions made by Sims was raised, and the court

held:

> By order dated October 11, 2006, the court sought additional briefing on the following issue about which it noted concern: "if, as this court has previously determined, Ronald Sims is due judicial immunity for employment decisions rendered during his tenure as Receiver of the Board (*see* Bowie v. Ronald Sims, et al., 2:05-CV-1050-RDP, Docs. # 13, 14 (N.D. Ala. December 7, 2005)), and if, as Judge Smith's July 8, 2002 Order appointing Sims as Receiver clearly outlines, the Board was stripped of any right to make employment decisions regarding Board members during the time that Sims was Receiver (*see* United States v. Jefferson County, 2:75-CV-666-CLS, Doc. # 935, at 2, 11-12 (N.D.Ala. July 8, 2002)), can the Board be held liable for any employment decisions made by Sims during his tenure?" (Doc. # 24). Having studied the parties' submissions and having considered the issue of the Board's liability at length, the court finds that the answer to its question regarding liability of the Board is not only found in the very document that appointed Sims to the position of Receiver, but is mandated by it. That Order — issued by Judge Smith of this court — makes clear that Sims was the sole party responsible for making employment decisions during the relevant time period, while the Board was stripped of the ability to have any input into (or role in making) those decisions. Thus, as outlined below, the Board is not — and cannot be — liable for the actions of Sims about which Plaintiff complains in this case.

> As a general rule, a corporation cannot be held liable for the acts of a receiver when the corporation had no power to act. *See* 65 Am.Jur.2d Receivers § 285 (2005); see also Atlanta, B. & A. R. Co. v. McGill, 194 Ala. 186, 69 So. 874, 874 (1915) (holding that a railroad corporation in receivership as appointed by a federal court did not have control over the acts of a receiver and therefore cannot be held liable for the actions of that receiver and noting it would be "a great injustice ... to deprive the railroad corporation of the custody and control of its property" and then hold it liable for acts of the receiver and its agents); Barnett v. Alabama Power Co., 213 Ala. 18, 104 So. 131 (1925) ("[T]he owner who has been dispossessed by a receiver is not liable for the wrongful conduct of the receiver or his servants in the use or operation of the property."). The court acknowledges that these decisions involve an application of state law, but also concludes that the rule of decision on this federal issue should be similarly analyzed and applied. While Sims, pursuant to Judge Smith's Order, was vested with "all authority necessary to ensure that the Board fully, faithfully, and lawfully complies in a timely, efficient and cost effective manner and with all functions and obligations required of the Board in terms of the Board's 1981 Consent Decree ... [including] full power to direct, control, operate, manage,

58

and administer the property, funds, and employees of the Board [and] all powers vested by Act No. 248 in the three members of the Board and Personnel Director, including the power to hire, promote, demote, transfer, and remove subordinates as necessary," and was assigned to "perform the financial, contractual, legal, administrative, personnel duties of the Personnel Director and Personnel Board [including] assess[ing] the present organizational structure of the Personnel Board," *the Board itself was divested of all the above-mentioned powers concerning Board employees.* (United States v. Jefferson County, 2:75-CV-666-CLS, Doc. # 935, at 2, 4-6, 11-12 (N.D. Ala. July 8, 2002)).  Judge Smith's Order specifically stated that "the members of the Jefferson County Personnel Board shall not perform the foregoing functions" with regard to Board employees as those duties were transferred solely to Sims, the Receiver. (United States v. Jefferson County, 2:75-CV-666-CLS, Doc. # 935, at 11 (N.D. Ala. July 8, 2002)).

It is undisputed that Sims, in accordance with Judge Smith's Order, was in fact the sole decision-maker who implemented the decisions about which Plaintiff complains in this case including the reductions-in-force (June 7, 2006 Henry Dep. at pp. 37, 61; Sims Dep. at pp. 48, 97), the assignment of new duties to Plaintiff (June 7, 2006 Henry Dep. at pp. 96, 98), and the transfer of Plaintiff to the Certification Department (June 7, 2006 Henry Dep. at p. 99).  Thus, because the Board was prohibited from any participation in the decisions at issue in this case, and because Sims was the only decisionmaker with regard to those decisions, it follows as a matter of law, fact and logic that the Board cannot be liable for actions that it did not and could not take.

519 F. Supp. 2d at 1179-81(footnotes omitted).  On appeal, the Eleventh Circuit Court of Appeals affirmed the district court's grant of summary judgment in favor of the Board, noting that the Board had "'vicarious immunity' for the receiver's actions because the receiver was entitled to judicial immunity."  Henry v. Jefferson County Personnel Board, 252 Fed. Appx. 308 (11th Cir. 2007)*(per curium)*.

The judicial immunity created by the district court's order appointing a receiver over the Board also was examined in Darryl Bowie v. Personnel Board of Jefferson County, and the motion for summary judgment was granted in favor of the Board based on judicial immunity created through

the order appointing Sims as receiver.  (Case No. 2:05-cv-1050-RDP, in the United States District

Court for the Northern District of Alabama, Doc. #30).  The order granting summary judgment was

appealed, and the Eleventh Circuit Court of Appeals affirmed.  Bowie v. Sims, 277 Fed. Appx. 884

(11th Cir. 2008), cert. denied, 129 S. Ct. 767 (2008).

While the plaintiffs in both Henry and Bowie were employees of the Board itself, and not

employees of entities within the Board's purview, that difference does not compel a different result.

The order appointing the receiver specifically gave to Sims "all powers vested by [the Enabling

Act];" which include the power to conduct the surveys and create the classifications about which

plaintiff complains.  During the receivership,[39] the Board was prohibited from taking any actions

except through Sims.  Any alleged failure by the Board to "enforce" its Rules or to compel

Homewood to pay or promote plaintiff falls within the sole authority of the receiver.  Because it is

clear that the order appointing Sims also clothes him in judicial immunity, plaintiff's claims against

the Board are likewise barred by that doctrine.


B.  Protectible Interest in Rank

Defendant Board also has moved for summary judgment on grounds that the plaintiff has

failed to demonstrate that the Board has deprived her of any constitutional right by failing to provide

---

[39]     Plaintiff's counsel argues that the "senior managers" of the Board did not believe that
the immunity applied to the Board, and that some duties had been "transferred back" to the Board
by June 2005, including the certification of payrolls.  However, plaintiff concedes that the receiver
was "not relieved of his responsibilities until after October 2008."  Accordingly, even though Sims
had ceased to personally manage all aspects of Board duties, the immunity created by the order still
existed until 2008.

her with due process.  In response, plaintiff asserts that she was entitled to an appeal or grievance procedure that was not provided.  She does not, however, address the threshold issue of whether she has a protectible property interest in the classifications of Municipal Records Supervisor or Minute Clerk.[40]

This court has discussed at length the requirement that the plaintiff demonstrate a protected interest in her rank, as opposed to her continued employment.  Where there is no such interest, there can be no due process violation.  Furthermore, there is no procedural due process violation because, as discussed above, Alabama law provides her with adequate post-deprivation remedies, including a suit against the Board in mandamus to compel it to perform its duties under state law.  For all the reasons set forth in the court's Report and Recommendation regarding defendant Homewood's motion for summary judgment, the plaintiff cannot present sufficient evidence of a due process violation to survive summary judgment.  Accordingly, the Board's motion for summary judgment on any due process claim is due to be granted.

<u>RECOMMENDATION</u>

Based on the foregoing, the magistrate judge RECOMMENDS the following:

1.  That the motion for summary judgment filed by the City of Homewood (Doc. #151) be GRANTED IN PART AND DENIED IN PART.  Specifically, it is RECOMMENDED that the

---

[40]        Plaintiff has retained employment at all times as an Administrative Assistant IV with the City of Homewood.  It is only the higher pay and grade that she claims have been denied her.

motion be GRANTED as to Count I, Count II, the retaliation claim contained in Count III, and parts of Count IV.  It further is RECOMMENDED that the motion be DENIED as to the FLSA overtime claim contained in Count III, and as to any breach-of-contract claim in which plaintiff alleges the defendant failed to properly pay her for overtime hours worked.

2.  That the motion for summary judgment filed by Linda Cook, Individually, (Doc. #147) be GRANTED, and all claims against Linda Cook in her personal capacity be DISMISSED WITH PREJUDICE.

3.  That the motion for summary judgment filed by the Jefferson County Personnel Board (Doc. #146) be GRANTED and all claims against it be DISMISSED WITH PREJUDICE.

Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

DONE this the 19th day of August, 2009.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE